**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David James,<br><br>　　　　Plaintiff,<br><br>v.<br><br>City of Apache Junction, et al.,<br><br>　　　　Defendants. | No. CV-23-00832-PHX-KML<br><br>**ORDER** |

　　　　Plaintiff David James worked as a police officer for defendant City of Apache Junction (the "City") from 2012 until his termination in 2022. Believing his termination was unlawful, James filed this lawsuit against the City, Police Chief Michael Pooley, and City Manager Bryant Powell.

　　　　James alleges he was terminated because of his disability and involvement in protected activity. Defendants counter that James was fired for his dishonesty surrounding the events of a traffic stop. Defendants are entitled to summary judgment on the federal claims and the parties must file statements explaining whether the court should remand the remaining claims to state court.

**I.　Background**

　　　　The undisputed facts of the events are outlined below. When disputed, James's version of events is accepted.

　　　　As of March 2021, James was serving as a police officer for the City. He had previously been the president of the Apache Junction Police Association (the

"Association"). (Doc. 74-2 at 62.) In his role as immediate past president of the Association, James sent a memorandum (the "Association Memo") to City leadership expressing concerns about police department management. (Doc. 74-2 at 62, 80–86.) The memo stated the Association believed "an immediate change in leadership" was necessary. (Doc. 74-2 at 86.) James contends the Association Memo marked the beginning of the City leadership's desire to terminate him. (Doc. 74-2 at 73.) When James sent the memo, Thomas Kelly—who is not a defendant here—was the police chief. Defendant Bryant Powell was the city manager and remained in that position throughout the alleged events.

In August 2021, James was involved in a traffic stop at a gas station. (Doc. 67-1 at 43.) The events of that traffic stop, and James's initial descriptions of those events, are central to this case. According to surveillance video of the encounter,[1] a member of the public not involved in the traffic stop (later identified as Karl Williams) was recording the traffic stop when James entered the frame and walked toward him. (Doc. 69-1, Ex. B at 3:05.) That prompted Williams to move laterally. (Doc. 69-1, Ex. B at 3:16–18.) James then continued to approach Williams, who moved backward. (Doc. 69-1, Ex. B at 3:18–3:19.) After the two seemed to talk while Williams continued filming, James grabbed Williams (Doc. 69-1, Ex. B at 3:27–29), who was then wrestled to the ground and arrested by James and another officer. (Doc. 69-1, Ex. B at 3:39–43.)

The police report James prepared presented a different version of events. (*See* Doc. 67-1 at 54–55.) According to the report, another officer warned James three times that Williams was approaching him. (Doc. 67-1 at 54; *see also* Doc. 67-1 at 106.) Each time James turned to check, Williams was closer than before. (Doc. 67-1 at 54.) Crucially, the report claims that when James turned to fully face Williams, Williams was already within arm's reach, meaning Williams approached James (instead of the other way around). (Doc. 67-1 at 54.) James ordered Williams to move away from the scene but Williams did not, then also did not put his hands behind his back when ordered to. (Doc. 67-1 at 54–55.)

---

[1] A deposition references two surveillance videos from the gas station. (Doc. 67-2 at 33.) A different deposition mentions only one. (Doc. 74-2 at 30.) Only one video was provided as an exhibit, so that is the one described here. (Doc. 69-1, Ex. B.)

1 When three officers could not restrain Williams's arms behind his back, he was taken to the ground and handcuffed. (Doc. 67-1 at 110.) Afterward, Williams requested medical attention, was evaluated by the fire department, and was taken into police custody. (Doc. 67-1 at 106.)

Williams was charged with criminal nuisance, resisting arrest, and hindering prosecution. (Doc 74-4 at 67.) While preparing for trial, Williams's defense attorney "attempted several times to schedule an interview with Sgt. James, who refused to complete the interview [until] mandated [to do so] by the municipal court." (Doc. 67-1 at 104.) During the interview (Doc. 67-2 at 40), James reiterated he did not advance toward Williams. (Doc. 67-1 at 58.) The city prosecutor ultimately dropped all charges against Williams due to a lack of evidence. (Doc. 67-2 at 6.)

Approximately two months after the incident with Williams, James oversaw a call involving a potential suicide. (Doc. 74-2 at 19.) James requested the SWAT team's deployment along with a commander's presence. (Doc. 74-2 at 19.) Another member of the police department called the SWAT team off. (Doc. 74-3 at 25, 27.) While James "had no issues with how the incident played out . . . [h]e did have issues with conversations that followed [it]." (Doc. 67-3 at 4.) Those conversations began after James sent an email to certain supervisors and administrative staff in which he was "critical of personnel and the Department protocol regarding the activation/response of SWAT." (Doc. 67-3 at 2, 3.) This email led to tension and an exchange of insults with Sgt. B. Rollins, who felt the email was disrespectful and unprofessional. (Doc. 67-3 at 3.)

James left work without permission the day of the SWAT incident but sent his commander a text requesting time off. (Docs. 67-3 at 2, 5, 74-3 at 28, 50.) James also turned in his department identification card but said it was not an indication he was resigning and instead because he needed some time off. (Doc. 67-3 at 4.) James also claims he told the commander about his history of post-traumatic stress disorder ("PTSD")—which he claims was exacerbated due to the incident (Doc. 74 at 4)—and that he was going to see his doctor. (Doc. 74-2 at 19.)

Former Police Chief Kelly "initiated an internal investigation into [James's] conduct" on the day of the SWAT incident, which was conducted by an independent third party (Pinal County). (Doc. 67 at 17.) The investigation found James violated the police department's policies and procedures, including by leaving work without being excused and by sending a disrespectful email to department members. (Doc. 67-3 at 4–5.) The report also "strongly suggested that the Police Department have a fitness for duty evaluation . . . before Sgt. James is returned to full duty." (Doc. 67-3 at 5.) That finding was partially based on James "demonstrat[ing]" and "verbally express[ing] that he has difficulty dealing with the stressors of his position and interpersonal co-worker relationships that affect his ability to perform his supervisory function at the Police Department." (Doc. 67-3 at 5.) The evaluation determined James was "fit for duty with considerations" such as a suggestion that he be required to attend a psychological counseling visit. (Doc. 74-3 at 61.) James believes the fit-for-duty exam was merely the administration's attempt to "get rid of [him] in an easy way." (Doc. 74-2 at 73.)

On November 3, 2021, then-police chief Kelly provided the Pinal County chief investigator with a document detailing allegations from two detectives "who believed that Sgts James" and two others "committed fraud schemes and theft from the City in recent pay scale negotiations." (Doc. 74-3 at 65.) The detectives believed James and other sergeants had "mis-represented themselves as [Association] representatives on the City recognized 'Pay Committee' and improperly acted to [e]nsure most Sergeants received better raises than the Officers and Corporals they were supposed to also represent." (Doc. 74-3 at 65.) After investigating, Pinal County did not find James or the other sergeants committed any wrongdoing. (Doc. 74-3 at 67.) James believes the combination of the Association Memo and his disclosure of his PTSD diagnosis led the police department to refer him for these criminal charges. (Doc. 74 at 5.)

On January 24, 2022—the same day Pooley replaced Kelly as the City's police chief (Doc. 74-2 at 30)—Williams served the City with a notice of claim alleging wrongful

- 4 -

arrest.[2] (Doc. 67-1 at 36.) After reviewing the claim, Pooley ordered Lieutenant Seth Painter to conduct an internal investigation. (Doc. 67-1 at 36–37.) Painter found James had committed multiple violations of police department policies. (Doc. 67-1 at 120–124.) He concluded there were "clear discrepancies" between James's report and the video evidence, noting James had "clearly" approached Williams despite stating repeatedly that he had not. (Doc. 67-1 at 119.) James has no quarrel with how the internal investigation was conducted. When asked whether he believed Painter had an improper motive against him, James said "[n]one whatsoever . . . I had a very good relationship with [Painter]." (Doc. 67-1 at 89.)

As a result of the Painter investigation, Pooley notified James of a pre-disciplinary meeting and gave him notice that "discipline is contemplated against you up to and including termination" based on policy violations related to Williams's arrest. (Doc. 67-1 at 126–127.) In response, James acknowledged the video showed he "took a few steps in [Williams's] direction" though he did "not recall walking towards him." (Doc. 74-4 at 47.) James maintained his actions resulted in a "lawful arrest." (Doc. 74-4 at 46.)

In May 2022, Pooley informed James of his termination, citing the video evidence, witness statements, and discrepancies in James's accounts of the traffic stop. (Docs. 67-1 at 39–40, 67-2 at 5.) Pooley stated the evidence was "sufficient on [its] own to sustain the misconduct at issue here"—meaning James's dishonesty surrounding the traffic stop.[3] (Doc. 67-1 at 39–40.) James appealed his termination to Powell, who upheld Pooley's decision. (Doc. 67-2 at 16–17.) Powell stated it was "clear" by a preponderance of the evidence that James's recollection of events was inaccurate because "[u]nder no realistic set of circumstances could David James have believed or remembered that Mr. Williams approached him to within arm's length" as James had claimed on multiple occasions. (Doc. 67-2 at 16–17.) James appealed to a neutral hearing officer who reviewed both parties'

---

[2] The City and Williams settled. (Doc. 67-1 at 61.)
[3] James said in his deposition that Pooley also brought up the pay scale fraud accusations "several times" in that conversation. When asked for more details, he said in "some of the termination documents [Pooley] talked about how there was, you know, felony charges filed against me." (Doc. 74-2 at 70.) James provides no evidence for this claim and the termination documents do not mention the pay scale allegations. (*See* Docs. 67-1 at 126–128, 67-2 at 5–9, 16–18.)

arguments, witness testimony, and supporting evidence and then affirmed Pooley's decision to terminate James. (Doc. 67-1 at 4–25.)

James contends his termination was inconsistent with how other officers were treated in similar situations. (Doc. 74-2 at 20.)

## II. Procedural History

James filed this case in state court and defendants removed it to federal court. (Doc. 1.) Defendants answered the original complaint (Doc. 3), but James then filed a second (Doc. 21) and third amended complaint (Doc. 27). James's third amended complaint asserted seven claims. (Doc. 27 at 7–13.) Defendants' motion to dismiss most of those claims is still pending. (Doc. 28.) James's motion to amend/correct his third amended complaint—filed just six days after he filed the complaint—is also pending. (Doc. 30.)

The third amended complaint asserts some claims solely against the City and others against Pooley and Powell. The claims against the City include: (1) wrongful discharge, (2) violation of Arizona's protections for public safety employees, (3) defamation, (4) false light – invasion of privacy, (5) a special action appeal (also brought against Powell), and (6) disability discrimination under the Americans with Disabilities Act ("ADA"). James also asserts a First Amendment claim against the City, Pooley in his individual and official capacity, and (read generously) Powell in his official capacity. (Doc. 27 at 7–13.) Defendants move for summary judgment on all claims.

Summary judgment is granted in favor of defendants on James's First Amendment and ADA claims. Because this case is in federal court based on federal question jurisdiction and summary judgment is granted in defendants' favor on both federal claims, the parties must file statements explaining whether the court should remand this case to state court.

## III. Analysis

Defendants' partial motion to dismiss is directed at James's First Amendment and state-law claims, while the motion for summary judgment addresses all claims.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted)). This is not a "probability requirement," but a requirement that the factual allegations show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movants (here the defendants) bear the burden of presenting the basis for their motion and identifying evidence they believe demonstrates the absence of a genuine issue of material fact. *Id.* at 323. A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### A. First Amendment Claim

Defendants' partial motion to dismiss (Doc. 28) is pending. It will be discussed briefly because it successfully forecloses two of the methods by which James can assert a *Monell* claim against the City. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). James's *Monell* claim and First Amendment claim against Pooley in his individual capacity both fail at the summary judgment stage.[4]

The third amended complaint attempts to assert a First Amendment claim against the City, Pooley, in his individual and official capacities, and Powell in his official capacity via 42 U.S.C. § 1983. (Doc. 27 at 8–9.) James's motion to amend seeks to add Powell (in his individual capacity) as a defendant for this claim. (Doc. 30.) Although not entirely clear, it appears James is attempting to assert the City and its alleged policymakers have a policy

---

[4] Official-capacity claims against municipal officers like Pooley and Powell are treated as claims against the City for *Monell* purposes. *See Ctr. For Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008).

- 7 -

or practice of treating those who voice concerns about the police department differently than those who do not.

To state a *Monell* claim, James must allege (1) he "had a constitutional right of which he was deprived; (2) the municipality had a policy; (3) the policy amounts to deliberate indifference to his constitutional right; and (4) 'the policy is the moving force behind the constitutional violation.'" *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) (quoting *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011)). A governmental policy is "a deliberate choice to follow a course of action . . . by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).

James can satisfy *Monell*'s policy requirement in one of three ways. *See Thomas v. County of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014) (per curiam). First, a local government may be held liable when it acts "pursuant to an expressly adopted official policy[.]" *Id.* (citing *Monell*, 436 U.S. at 694). Second, a public entity may be held liable for a "longstanding practice or custom." *Id.* (citing *Monell*, 436 U.S. at 694). Third, a local government may be held liable when "the individual who committed the constitutional tort was an official with final policy-making authority[5] or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Gordon*, 6 F.4th at 974 (quotation marks and citation omitted). In some circumstances, "a single action by the final decisionmaker may be sufficient to establish that a municipality has a policy that infringes on a person's constitutional rights." *Los Angeles Police Protective League v. Gates*, 907 F.2d 879, 889 (9th Cir. 1990) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)).

James argues the third amended complaint sufficiently alleges all three ways of satisfying the *Monell* policy requirement. (*See* Doc. 27 at 9.) In the pending motion to dismiss, defendants argue James did not plausibly plead the City itself had such a policy

---

[5] Courts use "final decisionmaker" interchangeably with "final policy-making authority." *See Los Angeles Police Protective League v. Gates*, 907 F.2d 879, 889 (9th Cir. 1990) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123–24 (1988)).

whether expressly adopted or as a longstanding practice. (Doc. 28 at 4.) They are correct.

James does not plausibly allege the City acted "pursuant to an expressly adopted official policy" or that it had a "longstanding practice or custom" of treating those who voice concerns about the police department differently than those who do not. *Thomas*, 763 F.3d at 1170 (citation omitted). To survive a 12(b)(6) motion to dismiss in the *Monell* policy/custom context, a plaintiff must at the very least "identif[y] the challenged policy/custom, explain[ ] how the policy/custom was deficient," and "explain[ ] how the policy/custom caused the plaintiff harm[.]" *Young v. City of Visalia*, 687 F. Supp. 2d 1141, 1149 (E.D. Cal. 2009) (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 682 (9th Cir. 2001)). James's complaint is devoid of any of these facts, merely alleging that defendants' "unlawful actions, decisions and omissions . . . were based on [its] policy, custom and practice." (Doc. 27 at 9.) These conclusory allegations are insufficient to support a claim at the motion to dismiss stage. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss).

James's response to the motion to dismiss seems to limit his claim to the third type of policy that may give rise to *Monell* liability, that is, the actions of or ratifications of subordinates' actions by an individual with final policy-making authority. (*See* Doc. 35 at 2 (alleging the "policy" at issue is defendants' "ability to exercise final policy and decision-making authority with respect to Police Department employees, including their discharges.").) But even assuming James's complaint sufficiently alleges Pooley or Powell "committed [a] constitutional tort" and that one of them had "final policy-making authority," summary judgment is granted for defendants on this theory because the undisputed facts show that the basis for terminating James was not unconstitutional. *Gordon*, 6 F.4th at 974 (quotation marks and citation omitted).

James claims his termination was unlawful retaliation for protected speech in violation of the First Amendment. (Doc. 27 at 8.) He identifies the protected speech at issue as the Association Memo (Doc. 74 at 3) in which he criticized the police department's

leadership. (Doc. 74 at 13.)

The Ninth Circuit has established a sequential five-step series of questions for courts analyzing a public employee's First Amendment retaliation claim:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Greisen v. Hanken*, 925 F.3d 1097, 1108 (9th Cir. 2019) (quoting *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009)). The plaintiff bears the burden on the first three questions. *Id.* (citing *Eng*, 552 F.3d at 1070–71). If the plaintiff meets this burden, the burden shifts to the defendant on the last two questions. *Id.* (citing *Eng*, 552 F.3d at 1071–72).

In seeking summary judgment, defendants challenge only whether James has shown his protected speech "was a substantial or motivating factor" in his termination. *Id.* (*See* Doc. 67 at 10–12.) It appears James is asserting Pooley was motivated to fire him because of his protected speech and Powell ratified the decision. James acknowledges he did not believe Powell himself had such a motive. (*See* Doc. 67-1 at 84 (James replying "I don't believe Bryant [Powell] did" in response to a deposition question asking whether James believed "Powell had an improper motive to terminate" him).)[6] So, the only question is whether there is evidence showing Pooley had an improper motive to terminate James. Such a motive could still make the City liable assuming Powell was the final decisionmaker regarding James's termination and that he ratified Pooley's allegedly unconstitutional basis for the termination. *See Gordon*, 6 F.4th at 974 (quotation marks and citation omitted) (a

---

[6] This admission undermines any claim against Powell in his individual capacity, so James's motion to amend his complaint to add such a claim is denied. (*See* Doc. 30.) James cannot create a factual dispute to avoid summary judgment by stating in his response that he believed Powell had a retaliatory motive in firing him when he previously admitted in his deposition that he did not hold such a belief. *See Bodett v. CoxCom, Inc.*, 366 F.3d 736, 748 (9th Cir. 2004) (holding a plaintiff did not raise an issue of material fact when her affidavit contradicted her deposition). And "courts have denied leave to amend where the plaintiff makes allegations that are contrary to facts of which he has personal knowledge or are verifiably false" as is the case here given James's deposition testimony. *Blagman v. Apple, Inc.*, 307 F.R.D. 107, 112 (S.D.N.Y. 2015) (collecting cases).

local government may be held liable when an official with final policy-making authority "ratifie[s] a subordinate's unconstitutional decision or action and the basis for it.").

James relies solely on circumstantial evidence to show Pooley had a retaliatory motive. Circumstantial evidence can create "a genuine issue of material fact on the question of retaliatory motive" to defeat summary judgment when the plaintiff provides "evidence that his employer knew of his speech"[7] and further "produce[s] evidence of at least one of the following three types": (1) a "proximity in time between the protected action and the allegedly retaliatory employment decision" such that a "jury logically could infer [that the plaintiff] was terminated in retaliation for his speech"; (2) "that his employer expressed opposition to his speech . . . to him or to others"; or (3) that "his employer's proffered explanations for the adverse employment action were false and pretextual." *Howard v. City of Coos Bay*, 871 F.3d 1032, 1045 (9th Cir. 2017) (quoting *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 751–52 (9th Cir. 2001) (internal quotation marks omitted)). Speculation alone is insufficient to sustain a retaliation claim. *Wood v. Yordy*, 753 F.3d 899, 905 (9th Cir. 2014) (citing cases).

James argues the third method applies here in that the stated reason for his termination—his dishonesty about the traffic stop incident—was pretextual. (Doc. 74 at 12–13.) Pretext may be shown when the stated reasons for an adverse employment action are demonstrably false or, even if true, are insufficient to justify the type of action taken by the employer. *Allen v. Iranon*, 283 F.3d 1070, 1078 (9th Cir. 2002); *see also Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 981 (9th Cir. 2002). Additionally, pretext has been found when an employee's conduct, though repeated, only led to discipline after they engaged in protected speech. *Anthoine v. N. Cent. Ctys. Consortium*, 605 F.3d 740, 751 (9th Cir. 2010). James has presented no such evidence here. Instead, defendants have provided undisputed evidence showing James was dishonest about the traffic stop and that the dishonesty led to his termination.

---

[7] Defendants argue Pooley had not "seen" the memorandum until after James was fired. (Doc. 67 at 10.) But Pooley testified at his deposition that he knew about the memo's contents (Doc. 67-2 at 12), so the court assumes James meets the employer-knowledge requirement.

James believes the true reason Pooley terminated him was because of the Association Memo which he sent fourteen months prior to his termination, before Pooley was Chief of Police.[8] (Doc. 74 at 12–13.) But it is undisputed that James did not come forward soon after the traffic stop, or even after having reviewed the surveillance video, to admit he made inaccurate statements in his police report and interview with Williams's attorney. Even by the time of his deposition, James was sticking to his guns. He acknowledged telling Williams's attorney he did not approach Williams and that the statement was inaccurate "according to the [surveillance] video." (Doc. 67-1 at 47.) But when asked whether the statement was accurate "according to reality[,]" James said "[p]erception is my reality" and reiterated that he stood by his police report because "[t]hat perception of those events was my reality." (Doc. 67-1 at 47.)

The parties' dispute about how quickly James should have come forward about the inaccuracy to prevent his termination (*compare* Doc. 74 at 8–9, 13–14 *with* Doc. 75 at 4–5) is immaterial. Defendants have presented undisputed evidence that James was terminated for his dishonesty, which persisted through the time of his interview with Williams's attorney months later. Although James argues that reason was pretextual because he eventually admitted to his dishonesty, he has produced no evidence showing he was fired because of the Association Memo. Rather, his months-long dishonesty about the traffic stop is a legally-sufficient and "obvious alternative explanation" for why he was fired. *See Gonzalez v. Planned Parenthood of Los Angeles*, 759 F.3d 1112, 1116 (9th Cir. 2014) (holding a plaintiff could not "overcome the plausible and obvious explanation" that the defendant did not knowingly submit false claims in violation of the False Claims Act). As such, James's argument about that he finally admitted his dishonesty is immaterial.

Two methods remain for James to attempt to show through circumstantial evidence that Pooley had a retaliatory motive for firing him. *See Howard*, 871 F.3d at 1032

---

[8] James also mentions "[t]he pay [scale] allegations" leveled against him "directly resulted from" that protected speech. (Doc. 74 at 13.) But even assuming the City's referral of James for criminal charges was an adverse employment action, James has not shown a causal link between the Association Memo and that referral as required for a First Amendment claim. *See Greisen*, 925 F.3d at 1108.

- 12 -

(simplified). James could show a "proximity in time between the protected action and the allegedly retaliatory employment decision" such that a "jury logically could infer [the plaintiff] was terminated in retaliation for his speech" or he could show "that his employer expressed opposition to his speech . . . to him or to others." *Id.* James has shown neither here and does not argue otherwise. His termination was fourteen months after he sent the Association Memo, and this is not a case in which a plaintiff repeatedly engaged in the same conduct (i.e., dishonesty regarding a traffic stop) but was only disciplined after the protected speech had taken place. *Cf. Anthoine*, 605 F.3d at 751. James also provides no evidence showing Pooley expressed opposition to the Association Memo. Although James argues Pooley "was skeptical of [the] good faith concerns" he raised in the memo (Doc. 74 at 2), the evidence James cites does not reflect skepticism about James's allegations of dishonesty and fraud. (*See* Doc. 74-2 at 28–31.) Rather, defendants cite uncontroverted evidence that Pooley believed some of the memo's points were valid. (*See* Doc. 75 at 3–4.)

James has not shown Pooley had a retaliatory motive for terminating him. Accordingly, he has failed to meet his burden to show his protected speech was a substantial or motivating factor for his termination. *Greisen*, 925 F.3d at 1108. Pooley is therefore entitled to summary judgment in his official and individual capacities on James's First Amendment claim.

Because James admitted Powell did not have a retaliatory motive to fire him, James "must prove" that Powell, the alleged final decisionmaker, "approved" of Pooley's "decision *and the basis for it*." *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (emphasis added) (simplified). So, James must show Powell had "knowledge of [Pooley's] alleged constitutional violation," *id.*, meaning he must have known of Pooley's retaliatory motive. *See, e.g.*, *Reardon v. Danley*, 74 F.4th 825, 828 (7th Cir. 2023) (for a First Amendment *Monell* claim to succeed, the city must have approved both the adverse conduct and the basis for it, i.e., the motivation). To survive summary judgment James had to provide evidence showing Powell knew Pooley's termination decision was made in

retaliation for sending the Association Memo, but that Powell terminated James nonetheless. *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1066 (9th Cir. 2013) (citation omitted). James has not done so here, so Powell is entitled to summary judgment on his First Amendment claim.

James presents additional arguments that he believes are relevant to his First Amendment claim, but they have no bearing on it. He mentions other employees who he believes advocated for his dismissal and had improper motives for doing so, but none of them are defendants here. (Doc. 67-1 at 84.) And James does not argue how these non-parties influenced Pooley's decision to terminate him or Powell's decision to affirm the termination.

James also argues "[d]efendants' treatment of [him] was [ ] markedly different than its treatment of others" such as "another officer involved in [the traffic stop who] was not terminated despite recalling and telling the same events of the day as [James]." (Doc. 74 at 7.) To the extent comparators are relevant in First Amendment analyses, James has not shown his alleged comparators were similarly-situated. *Cf. Chuang v. Univ. of California Davis, Bd. Of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000) (comparing plaintiff to other similarly situated individuals at the summary judgment stage of a Title VII case). As defendants point out, the other officers involved in the traffic incident "did not prepare the police report containing misrepresentations, nor were they interviewed by Williams's attorney and provided a false account." (Doc. 75 at 7 n.2.) Nor was the other officer James cites as a comparator accused of lying or dishonesty; the officer was investigated for using excessive force. (Docs. 75 at 7 n.2, 74-2 at 49–50.)

Because Pooley and Powell are entitled to summary judgment on this claim and for *Monell* purposes official-capacity claims against municipal officers are treated as claims against the City, the City is also entitled to summary judgment. *See Ctr. For Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008).

For all these reasons, summary judgment is granted in favor of the City and in favor of Pooley in his individual capacity on James's First Amendment claim.

### B. Americans with Disabilities Act Claim

James also claims defendants terminated him "because of his disability" in violation of the ADA. (Doc. 74 at 19.) "To prevail on an ADA claim of unlawful discharge, the plaintiff must establish a prima facie case by showing that: (1) he is a disabled person within the meaning of the statute; (2) he is a qualified individual with a disability; and (3) he suffered an adverse employment action because of his disability." *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 891 (9th Cir. 2001) (simplified). James asserts he is a "qualified individual" with a disability based on his PTSD diagnosis. Defendants do not dispute this point. The parties only disagree about whether James was fired *because of* his PTSD.

James claims Pooley fired him and Powell affirmed the decision not because he was dishonest about the traffic stop incident but because he has PTSD. (Doc. 74 at 19.) It is not even clear James's ADA claim would survive a motion to dismiss. He makes only one relevant allegation and provides no factual support for it in his complaint. (*See* Doc. 27 at 12–13.) But even assuming James's ADA claim is pleaded sufficiently, it fails at summary judgment. To succeed on his ADA claim, James "must show that the adverse employment action would not have occurred *but for* [his] disability." *Murray v. Mayo Clinic*, 934 F.3d 1101, 1105 (9th Cir. 2019) (emphasis added). In his one-paragraph response opposing summary judgment on his ADA claim, James cites only one piece of evidence: that "Pooley was well aware of [his] disability before his decision to discharge [James], including requiring him to undergo an unnecessary [fit-for-duty] exam." (Doc. 74 at 19.) But James does not cite anything supporting this assertion and the undisputed evidence refutes it.

James said in his deposition that he could not "say for certain when [Pooley] would have found out" about his PTSD "or if he was [ ] one hundred percent informed on it." (Doc. 67-1 at 87.) Rather, James believed Pooley "should have known with the fitness for duty" examination that he had PTSD. (Doc. 67-1 at 87.) When asked whether he thought Pooley decided to terminate him upon learning about his PTSD, James's response was: "I can't speculate" as to that. (Doc. 67-1 at 87.)

Even assuming Pooley knew about James's PTSD diagnosis before firing him,

James has still not provided evidence to support his ADA claim because he must show he was fired *because of* his PTSD, not merely that someone knew about his disability before firing him. *See id.*; *see also Austin v. Horizon Hum. Servs. Inc.*, No. CV-12-02233-PHX-FJM, 2014 WL 1053620, at *5 (D. Ariz. Mar. 19, 2014) (noting speculation without specific or substantial evidence cannot satisfy the causation standard for an ADA claim.) James has provided no meaningful argument, nor any evidence, on this point. The same reasoning applies to James's argument that Powell "rubber stamped" Pooley's decision "despite available evidence that contradicted Pooley's alleged reason for firing" him. (Doc. 74 at 19.) Defendants provide undisputed evidence that Powell did not know James had PTSD while James was still employed by the police department (Doc. 67-3 at 8), and James has provided no evidence to show Pooley fired him because of his PTSD. The City is entitled to summary judgment on his ADA claim.

## IV.     Supplemental Jurisdiction

Eliminating the sole bases for federal jurisdiction requires the court to address whether to exercise supplemental jurisdiction over the remaining state-law claims. 28 U.S.C. § 1367(c)(3). The court must decide if "remanding the [remaining] state claims comports with the underlying objective of most sensibly accommodat[ing] the values of economy, convenience, fairness, and comity." *Exec. Software N. Am., Inc. v. U.S. Dist. Ct. for Cent. Dist. of California*, 24 F.3d 1545, 1557 (9th Cir. 1994) (simplified), *overruled on other grounds by California Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087 (9th Cir. 2008)). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988), *superseded by statute on other grounds by* 28 U.S.C. § 1447(c).

The remaining disputes are state-law claims against the City and one state claim against Powell. The parties debate whether the notice of claim James submitted to the City—which is required before James can pursue claims against the City—was valid. (*See* Docs. 28 at 7–10, 35 at 7–10, 36 at 4–5.) These state-law claims involve a state-law

question which has not been definitively answered by the Arizona Supreme Court, specifically whether Arizona law governing the exemption of prohibitory injunctions from Arizona's notice-of-claim statute extends to mandatory injunctions like the one James sought. *See State v. Mabery Ranch, Co., L.L.C.*, 165 P.3d 211, 245 (Ariz. Ct. App. 2007) (holding that Arizona's notice of claim statute does not apply to claims "in which a private party seeks an injunction restraining conduct by a public entity."). Although this case has already meaningfully progressed in federal court, the court would have to conduct an *Erie* guess as to what the Arizona Supreme Court would decide on this issue. *See Thornell v. Seattle Serv. Bureau, Inc.*, 742 F. App'x 189, 191 (9th Cir. 2018) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). And the Supreme Court recently reiterated that federal courts should ordinarily "kick the case to state court" if it raises a novel issue of state law. *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. ----, 2025 WL 96212, at *5 (U.S. Jan. 15, 2025.)

At present, the balance of factors tilts in favor of declining to exercise jurisdiction over the remaining state-law claims. The unresolved state-law question further tips the balance that way. As a result, the parties must file statements providing their position on remanding the remaining claims to state court.

## V.  Conclusion

James failed to adequately plead the existence of a City policy or custom, so the City's motion to dismiss is granted to the extent it makes that argument. As to what remains of James's *Monell* claim, the undisputed material facts show defendants are entitled to summary judgment because James failed to show the exercise of his First Amendment rights was a substantial or motivating factor in his termination. James's motion to amend his complaint to add a claim against Powell in his individual capacity is denied because James cannot allege Powell violated his First Amendment rights consistently with the undisputed evidence. Summary judgment is also granted to defendants on James's bare-bones ADA claim because, even construing those facts in his favor, James failed to show his PTSD was the but-for cause of his termination.

Accordingly,

**IT IS ORDERED** the Motion to Dismiss (Doc. 28) is **GRANTED IN PART** and **DEFERRED IN PART**.

**IT IS FURTHER ORDERED** the Motion to Amend (Doc. 30) is **DENIED**.

**IT IS FURTHER ORDERED** the Motion for Summary Judgment (Doc. 67) is **GRANTED IN PART** and **DEFERRED IN PART**.

**IT IS FURTHER ORDERED** no later than **February 14, 2025**, the parties shall file statements addressing whether the court should exercise supplemental jurisdiction over the remaining state-law claims.

Dated this 30th day of January, 2025.

_____
Honorable Krissa M. Lanham
United States District Judge